## PEOPLE v. CHILDS.

(Supreme Court, Appellate Division, First Department. January 8, 1904.)

1. HOMICIDE—SELF-DEFENSE—EVIDENCE—INSTRUCTIONS.

On prosecution for murder defendant testified that he was assaulted
by deceased, and during the struggle he felt something hard under de-
cedent's coat, which decedent was attempting to draw out; and that de-
fendant, apprehending danger, drew his pistol and shot deceased; that
after deceased fell he saw a club protruding from his pocket, and later
some one gave this club to the policeman who had arrested defendant.
A club was offered in evidence, but defendant would not swear that it
was the club he had seen, but that it was similar. The court admitted
the club for the purpose of illustration, and "not as the particular instru-
ment which defendant saw, but as one similar." No reference to the
club was made in the instructions, and in reply to questions from the
jury, as to whether the club was in evidence or whether the jury were
to disregard it, the court answered that it was in evidence for the pur-
pose expressed, and not as the identical instrument that the defendant
claimed to have seen; that they might regard it as of value or disregard
it. Held, that this was error, defendant being entitled to an instruction
that if the club in evidence was the one in possession of the decedent
they could not disregard it, but that it was important evidence in con-
nection with defendant's testimony.

2. SAME—EVIDENCE—FLIGHT—INSTRUCTIONS.

Where defendant shot and killed deceased during a struggle, alleging
self-defense, he was entitled to have the jury instructed that they might
take into consideration the fact that defendant remained at the scene
of the homicide, and did not run away.

3. SAME—CHARACTER.

Where, on prosecution for murder, the evidence of self-defense was
conflicting, that of the state depending mainly on the credibility of tes-
timony of friends of decedent and rivals of defendant, defendant was
entitled to an instruction that his character might be such as to lead the
jury to believe that the evidence against him was false, and it was not
sufficient to merely charge that the evidence of good or bad reputation
was before the jury, who were the judges of its value, and might attach
whatever importance to it they thought proper.

Appeal from Court of General Sessions, New York County.

Alfred Childs was convicted of murder in the second degree, and
appeals. Reversed.

See 84 N. Y. Supp. 853.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON,
INGRAHAM, and LAUGHLIN, JJ.

Lewis Stuyvesant Chanler, for appellant
Robert C. Taylor, for the People.

LAUGHLIN, J. The people showed, and the defendant, a witness
in his own behalf, admitted, that on the 2d day of April, 1902, short-
ly after 1 o'clock in the afternoon, the defendant shot and killed

Patrick J. Malone with a pistol in front of the Army Building at the corner of Moore and Pearl streets, in the city of New York. The defendant claimed that he did the shooting in self-defense. He was employed by the Protestant Episcopal Church Missionary Society as a "runner" to solicit boarders and lodgers for the New Seamen's Home, 52 Market street, New York City. The decedent was employed as a runner by M. H. Murphy, who kept a sailors' boarding house. There was evidence tending to show an unfriendly feeling on the part of the proprietors of sailors' boarding houses and their runners toward the New Seamen's Home and its employés engaged in soliciting patronage for it. The defendant testified that he had been in the employ of the missionary society for about a month; that on several occasions he had met the decedent and other runners for and some proprietors of sailors' boarding houses; that they had frequently threatened to "blow the missionary society's home to hell, and the employés connected with it," and had threatened "to do me up" on several occasions; that at about 10 o'clock on the morning of the homicide he met the decedent and three others, who had previously made these threats, and two others unknown to him, on South near Front street.; that the six were together, and as he approached them they opened up and let him pass through between them; that as he got through, the decedent, with clinched fist, hit him on the right shoulder; that he turned around and asked decedent what he was looking for, whereupon decedent called him out of name, and made an insulting remark indicating a bitter feeling toward the missionary society, and toward defendant on account of his connection with it, and thereupon one of the others hit him in the ribs, and they all laughed at him; that he then walked away, and went home and procured an old pistol, thinking that he would have to use it sooner or later, and believing that he needed some means of defense; that the pistol had five chambers, all loaded since January, and was rusty; that he then went to luncheon, and thought that it might be unsafe for him to use this pistol, as it might explode in his hands, and therefore he bought a new revolver on the Bowery of the caliber of cartridge which he had brought from home with the rusty revolver; that he went into the toilet room of a saloon, and loaded its five chambers, and then put the revolver in his left-hand outside overcoat pocket, leaving the rusty revolver loaded in his other outside overcoat pocket; that he then looked for another employé of the missionary society, who also acted as a runner, but was unable to find him, and visited different places in the lower part of the city where he was accustomed to obtain information or transact business, and finally, shortly after 1 o'clock, came up Pearl from Whitehall street on the same side as the Army Building, and met the decedent a few feet from the corner of Moore street; that the decedent struck at him with his left fist, and he "ducked it" and hit the decedent in the face with his left fist; that the decedent then grabbed hold of him with both arms, holding the defendant's arms down; that defendant also caught hold of decedent, and tried to get away, but could not, and then tried to throw decedent, but was unable to do so; that defendant had seen one of decedent's friends, who had

previously threatened him, in that vicinity about 20 minutes before, and thought decedent was holding him for others "to plug me or assault me"; that defendant felt something hard under decedent's coat, and decedent reached toward and seized it with his right hand, and defendant thought decedent was about to draw "this gun, or whatever he had underneath his coat—this thing I felt"; that defendant then took hold of decedent's right arm with his left hand, endeavoring "to hold him there," and at the same time reached for the new revolver which was in his left-hand outside overcoat pocket, and had some difficulty in getting it, owing to the fact that decedent was holding him tight; that decedent was struggling "to get this thing, whatever it was—get it out of his pocket"; that defendant thought decedent had a gun there, and also thought there was some one behind him, and after he got hold of his revolver and his arm up far enough he pulled the trigger and decedent dropped; that decedent fel with his head against the Army Building, and defendant turned around "to see if there were any more around there," and then turned and looked at the decedent, and observed "a club about three inches long sticking out from underneath his coat." Defendant further testified concerning this club: "I could see that much. I could see three inches of the club. Whether he had a gun or not I do not know. It was very much like this club (showing witness club). It was very much like that, although I could not swear to it. I saw that club afterwards in the hands of the policeman. A young fellow gave the club to the policeman in my presence." The court then inquired whether the witness meant that the club produced in court or the one he saw decedent have was the one given to the policeman, and defendant's counsel answered, "This one here." The witness then further testified, "In my presence this club was given to the policeman by a young man." The court then inquired whether the witness meant to say that the club exhibited in court was the identical club that he saw sticking out of the decedent's coat, and the witness answered:

"I could not swear to that. * * * It was just like it. At the time I was struggling with Malone, and he had his hand on this hard substance that I felt, I apprehended that I was about to be killed, and that grievous bodily harm could be inflicted upon me. It was after that I resorted to my pistol—after he put his hand underneath his coat. * * * It was with this feeling that I did as I have described."

The defendant stepped back one or two paces, and remained there, "standing quietly," until a policeman came, to whom he voluntarily handed the revolver, and admitted that he had shot the decedent. The testimony of some of the witnesses for the people was to the effect that he assigned as a reason for the shooting that decedent had assaulted him in the morning, and that of others was to the effect that he claimed to have fired in self-defense. A policeman who arrested him there almost immediately after the shooting testified that after he had handcuffed the defendant he took him over to be identified by the decedent, who was still in the position where he fell, and as he did so, and while standing by the decedent, some one in the crowd and near decedent handed him this "billy," saying, "Here is a billy." Counsel for the defendant thereupon offered the billy in evi-

dence. This was objected to, and the objection was sustained, and defendant excepted. The defendant, before resting his case, again offered the billy in evidence, and the court remarked: "For the purpose of illustration I will allow the offer. It is not in evidence as to the particular instrument which the defendant saw, but as one similar to one which he said he saw." No reference to the billy was made in the charge. The jury, after retiring, sent the following question to the court: "We would like to know what your honor's charge was relative to the billy introduced in the case." The court, by consent of counsel, returned the following reply: "No reference to the billy was made in the charge of the judge." Soon after the jury desired further instructions, and were brought into court, and through their foreman they asked: "First, was the billy in evidence before the jury? Second, are we to disregard it?" The only answer of the court to the first request was the reading of part of the testimony relating to the billy, and the remarks of the court in receiving it in evidence for the purpose of illustration. In answer to the second request the court said "that so long as the instrument called a billy is in evidence for the purpose so expressed by the court when it was received in evidence, not as the identical instrument that the defendant claimed to have seen, but as one similar to it, it was in for the purpose of illustration, and therefore it is for your consideration. You may regard it as of value, and you may disregard it as of no value. It is wholly a question for your determination. It is before you for the purpose indicated, and it lies with you to attach what importance to it you think proper, or to disregard it wholly if you think proper. It is a question of fact, wholly resting with you." Counsel for the defendant thereupon excepted to these instructions, and requested the court to instruct the jury that the billy was in evidence, and that the jury could not disregard it. The court declined, and counsel for the defendant excepted. The foreman of the jury then asked whether the law made this billy a deadly weapon, or described it as such, to which the court answered in the negative, and to this counsel for defendant also excepted.

We are of opinion that the defendant was entitled to have the billy received in evidence, and that the jury should have been instructed that if they found that it was the identical club that was in the possession of the decedent, as they might well have found upon the evidence, then they could not disregard it, and that it became important evidence, in connection with defendant's testimony, that he felt it in decedent's pocket, and that decedent was endeavoring to get hold of it with the apparent object of using it upon the defendant, and that, fearing that it was a revolver or deadly weapon of some kind, and that his life was in peril, he shot the decedent in self-defense. According to the witnesses for the people the defendant was the aggressor, and first assaulted decedent with his fist, and then without their clinching, and with nothing to prevent defendant's firing from in front, he closed in on decedent, and fired from behind the latter's head, the ball entering about an inch back of the left ear, and passing forward and upward, lodging near the skull on a line with the right ear. As has been seen, the rights of the defendant were

not protected by any reference in the charge either to this billy or to the club that was in decedent's pocket, if it be not the same. It is manifest from the questions asked by the jury that they regarded it as of considerable importance; and it is also evident, I think, that they believed, and the evidence justified a finding, that it was the identical club or billy that was in the possession of the decedent. The refusal of the court to admit it in evidence generally, and the failure of the court to instruct them properly upon its bearing as evidence, could scarcely fail in these circumstances to prejudice the defendant.

.The court was also requested to instruct the jury that "they may take into consideration the fact that defendant remained at the scene of the homicide and did not run away." This was a significant fact, and the jury, had their attention been drawn to it, might have considered that it tended to show that the shooting was done in self-defense and without criminal intent. Had the defendant, instead of remaining there, endeavored to escape, it would have been considered as tending to show his guilt. No reference to this fact was made in the charge. We think the defendant was entitled to have the attention of the jury drawn thereto by the court, and that it was error to refuse the request.

Defendant showed previous good character by the testimony of several reputable witnesses. Counsel for the defendant requested the court to instruct the jury "that the character of the accused may be such as to create a doubt in the minds of the jury, and lead them to believe, in view of the improbability of a person of such character being guilty, that the other evidence is false." This was declined, and defendant excepted. As has been seen, there was a conflict of evidence with reference to the circumstances under which the shooting occurred. The evidence on the part of the people tended to show not only that the defendant was the aggressor, but also that the circumstances under which he provoked the quarrel indicated that he had armed himself, not for the purpose of using the weapons in self-defense, but for the purpose of murdering decedent. This evidence, however, was not of a conclusive character. In the main, it depended upon the credibility of the testimony of friends of decedent and rivals of the defendant. In these circumstances he was entitled to have the jury fully and clearly instructed as to the effect that might be given to the evidence of previous good character. In People v. Elliott, 163 N. Y. 14, 57 N. E. 103, the Court of Appeals reversed a conviction of rape for a failure to charge a request in the identical language of the request refused in the case at bar. It follows that the proposition contained in the request is sound. It contains one element, at least, that was not covered by the charge. The main charge as to the effect of character evidence was clearly insufficient. The court said:

"Evidence as to character has been given here. Evidence as to the bad reputation of the deceased for peace and quiet has been given to you, and evidence of his good reputation for peace and quiet has been given to you. Evidence of the good reputation of the defendant for peace and quiet has been given, and evidence of his bad reputation for peace and quiet has been given. You are the judges of the value of this testimony. You can attach to it whatever importance you think proper. You may take the evidence of the good char-

acter of the defendant in connection with all the other circumstances and facts of the case. You may also consider the evidence of his bad character."

The court in the main charge had failed to instruct the jury upon the law relating to the different degrees of manslaughter. The jury were subsequently brought back into court and instructed on this subject, and thereupon the court further charged on the question of character evidence as follows:

"While I have charged you on the question of character in, as I thought, an exhausted way, sufficient for this case, I will not recall to your attention that question. You have heard the testimony for and against the character of this defendant. You can take it all into consideration. You can give to the whole testimony, or to any part of it, such credence as you think proper. The whole question is one for your consideration. You may take into consideration all the facts and circumstances in the case. Good character of itself may sometimes of itself create a reasonable doubt where otherwise it would not exist; but whether it does here is a question for you to determine. The whole question of fact is for your determination."

It will be observed that in these instructions the court did not inform the jury that the evidence of good character might be considered in determining the truthfulness of the testimony indicating the defendant's guilt. That is its only importance, and yet the average juryman might not so understand it. Courts have had some difficulty in comprehending and applying character evidence in these cases, with the result that many convictions have been reversed. The jury have not the pardoning power nor do they impose the sentence. The ordinary layman, if he reflected, would know that; but he might think, as many judges have thought, that evidence of good character was only valuable in doubtful cases, and he might not understand that he was at liberty to disbelieve the testimony of the people's witnesses on account of the fact that the defendant's character and reputation were such that it was improbable that he would commit the crime charged. If the jury had been so instructed they would have been better able to understand the value of the evidence of previous good character. The Court of Appeals in Remson v. The People, 43 N. Y. 8, said:

"There is no case in which the jury may not, in the exercise of a sound judgment, give a prisoner the benefit of a previous good character. No matter how conclusive the other testimony may appear, the character of the accused may be such as to create a doubt in the minds of the jury, and lead them to believe, in view of the improbabilities that a person of such a character would be guilty of the offense charged, that the other evidence in the case is false, or the witnesses mistaken. An individual accused of crime is entitled to have it left to the jury * * * whether he, if his character is previously unblemished, has or has not committed the particular crime alleged against him. 2 Russ. on Crimes, 785. The weight of the evidence is for the jury alone to determine. 3 Greenl. on Ev. § 25."

It was therefore, we think, error to refuse this request.

The cases already pointed out require that the defendant should have a new trial. It is therefore unnecessary to decide whether any of the other alleged errors urged upon the appeal, or the conduct of the court, of which the defendant complains, was so prejudicial to his right as to require a reversal.

The judgment and order should be reversed, and a new trial granted. All concur.