(90 App. Div. 219.)

### PEOPLE v. LAGROPPO.

(Supreme Court, Appellate Division, First Department. December 22, 1903.)

1. HOMICIDE—CORPUS DELICTI—DIRECT PROOF—WAIVER.
   Where both the people and the defendant, in a prosecution for homicide, assume during the progress of the trial that the person defendant was charged with killing was the same person who was dead and buried, direct proof of the corpus delicti by the people is not necessary to a conviction.

2. SAME—MURDER IN SECOND DEGREE—EVIDENCE—SUFFICIENCY.
   Evidence in prosecution for homicide considered, and *held* sufficient to support a conviction of murder in the second degree.

3. SAME—EVIDENCE—DECLARATION OF WITNESS.

The refusal of the court, in a prosecution for homicide, to strike out the testimony of a witness that when she observed from a distance the chase of the decedent by defendant and others, she cried, "There goes on murder here," is not cause for reversal, where no exception was taken to the ruling, and, on the undisputed proof, it was shown that murder did go on.

4. SAME—KNIFE AS EVIDENCE.

Where a knife was identified as the property of defendant, in a prosecution for homicide, and there was evidence that he had it open and in his hand when he was engaged in the pursuit of deceased, and that he used it on deceased, coupled with the character of the wounds, and the fact that the knife would produce such wounds, it was properly admitted in evidence.

5. SAME—CONSPIRATORS—FELONIOUS INTENT—STATUTE.

Where, in a prosecution for homicide, it appears that defendant and others acted with a common purpose, in concert one with the other, to take the life of deceased, each is guilty, no matter which did the killing, under Pen. Code, § 29, making every one of the persons so engaged a principal in the transaction, and responsible for the acts of the other.

6. SAME—INSTRUCTION.

Where the court, in a prosecution for homicide, submits the case to the jury on the theory of murder in the second degree, when the evidence was sufficient to justify a conviction of murder in the first degree, the error is not prejudicial to defendant.

7. SAME.

In a prosecution for murder, the court, in charging the jury, stated: "It is not necessary for me to refer to the events preceding the flight. They have been most elaborately discussed by counsel, and the discrepancy between the witnesses on both sides has been dwelt on at considerable length. This, however, need not embarrass you in your deliberations, in view of the principles of law which I have read to you." This was followed by a declaration of law on the subject of the commission of a felony by two or more, to which the court added: "All the testimony that goes to what precedes is only important, I think, as concerning the motive actuating the parties." The evidence disclosed that a fight arose over a game of ball, in which deceased struck and probably stabbed defendant, and then ran for some distance before he was overtaken and killed. *Held*, that a contention that by this charge the court took from the jury the importance of the facts given in evidence of the circumstances surrounding the original dispute is without merit.

8. SAME.

A charge, in a prosecution for homicide, submitting to the jury the question as to whether the defendant stabbed the decedent in self-defense, does not prejudice the defendant, though the evidence did not justify the charge.

9. SAME—REASONABLE DOUBT.

A reasonable doubt is properly defined, in charging the jury on homicide, as such a doubt as a man of reasonable intelligence can give some good reason for entertaining if he is called on to do so.

10. SAME.

A charge in a prosecution for homicide that the people are obliged to make out their case beyond a reasonable doubt is proper.

Appeal from Trial Term, New York County.

Luigi Lagroppo was convicted of murder in the second degree, and appeals. Affirmed.

¶ 6. See Homicide, vol. 26, Cent. Dig. §§ 716, 717.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Charles G. F. Wahle, for appellant.
Howard Gans, for the People.

HATCH, J. It is claimed on behalf of the people that on the 30th day of May, 1902, at about half past 5 o'clock in the afternoon, Antonio Avocato came to his death from wounds inflicted upon his person by the defendant. While there is considerable contradiction in the testimony, yet upon all of the essential features of the case there is little conflict. It was made to appear upon the part of the people that a short time prior to the infliction of the wounds there had been a dispute between the deceased and Antonio Lagroppo, a brother of the defendant, over a game of ball, which the deceased and the three Lagroppo brothers, Luigi, Antonio, and Domenico, had been playing in the yard in the rear of the premises at 319 East 115th street, in the borough of Manhattan. In the course of the dispute, Antonio felled the deceased with a blow in his face. The deceased arose, and came out into 115th street by passing through the hallway of No. 319. As he came out of the hall he was seen by several witnesses running down the street, with the three Lagroppo brothers in pursuit; the defendant being first, with Domenico and Antonio second and third, respectively. The deceased ran about 100 feet, when the defendant overtook him. What then occurred is the subject of considerable contradictory testimony. There is, however, no dispute but that at this place, and at the hands of one or all of the three brothers, Avocato received the wounds from which he subsequently died. Some of the witnesses testified that when the defendant overtook Avocato he seized him by the collar, stabbed him, and then fell upon him; that the other two brothers fell or jumped on top of the men who were down. Other witnesses state that Avocato stumbled and fell; that the defendant threw himself upon him, and was seen to strike him; and that Domenico came with a long stiletto, and was seen to strike with that after he had thrown himself upon the prostrate men. Within a few seconds after the fall, the men arose from the street, and it was found that Avocato had received wounds from which he thereafter died. It was also found that the defendant had received two stab wounds—one in each arm, near the shoulder. It is testified to by all of the witnesses that the pursuit of Avocato by the three brothers in the street took place. It was claimed, however, that Avocato was the aggressor, and that he struck the defendant in the hallway with a knife, inflicting the wounds upon his arms; and he then ran, and was pursued by the three brothers; and that the defendant was in the lead. Some of the witnesses testified that when he was in pursuit the defendant had a knife in his hand; others, that he had no knife, but that it was Domenico who had the knife, and who did the stabbing; and the defense relied upon the latter statements to acquit the defendant, claiming that there was no proof which would warrant a finding that the wounds were inflicted by the defendant, but that whatever injury was done was done by Domenico. Shortly

after the affray, officers found the defendant in a room occupied by him at 321 East 115th street. He was partly undressed, and rags were tied around his wounds. When questioned as to the occurrence and how he got his injuries, he stated that he was trying to separate the combatants in a fight in which his brothers were engaged, and that one of his brothers had stabbed him. A similar declaration was also testified to by a witness who saw the defendant upon the street immediately after the affray. One of the police officers subsequently found a knife under a starch box upon the fire escape of the next house. It was produced upon the trial, and was claimed by the people to have been identified as a knife belonging to the defendant, and that the wounds upon Avocato were of such a character as could have been inflicted with this knife. The two brothers Domenico and Antonio escaped, and have never been arrested.

There is a distinct hiatus in the proof as to what became of Avocato immediately after the wounds were inflicted. Two witnesses testified that he got up from the street, and went to a drug store at 115th street and 1st avenue. Of what occurred in the drug store there is no proof. Where Avocato was thereafter taken, does not appear. The next that is testified concerning him comes from George Beller, a police officer, who states that some time on the 30th day of May, the hour of which he does not give, he saw "the deceased, the dead man," when he was in the station house; that he found the ambulance at the door of the station house; that he jumped on behind with Officer Hollahan, and they were driven up to 321 East 115th street. Whether the body was in the police station or in the ambulance, or what was done with it, nowhere appears. The next information of the whereabouts of the body is that it was in the morgue at the foot of East 26th street, in the city and county of New York. How it got there is not disclosed. By reason of this failure to produce evidence, counsel for the appellant is enabled to address this court, in serious argument, that the proof is insufficient in identification of the body found at the morgue with Antonio Avocato, who was stabbed in the affray. The argument is clearly justified from the state of the record in this respect. The defendant was indicted for the crime of murder in the first degree. It therefore became incumbent upon the people to establish by direct evidence the corpus delicti. It is made up of two component parts—death as the result, and the criminal agency of another as the means. One of these component parts must be established by direct proof. One being established by such proof, the other can be made out by circumstantial evidence. Ruloff v. People, 18 N. Y. 178; People v. Bennett, 49 N. Y. 137.

It appeared that wounds were inflicted upon Avocato at the time of the affray, yet it did not appear what the specific nature and character of those wounds were, or whether they were sufficient to produce death. All the proof upon that subject is that Avocato was stabbed in the body; that when the persons removed themselves from his body he rose to his feet and walked away—whether with or without assistance, does not clearly appear. As to where or when he died there is not a syllable of proof. We do not find it necessary, in view of the disposition which we make of the questions presented by this appeal,

to determine whether the direct testimony is sufficient to show that death resulted from the criminal act of the defendant committed at the time of the affray. There is some direct evidence to establish such fact. Upon this subject, however, we express no opinion.

The people, to sustain this judgment, rely upon the sufficiency of the proof to establish that the body found at the morgue was the dead body of Avocato, who was wounded in the affray. The proof upon this subject is given by Joseph Trapani, an undertaker, who, it is claimed by the people, buried the body of Avocato. He testified: That he had known Antonio Avocato three or four years before the 30th of May, 1902. That he saw him on the morning of that day. That he next received an order from his wife to bury the body, but could not remember whether he received the order on the 1st of June. Thereupon he went to the coroner, and obtained a permit to remove the body, which he called that of Antonio Avocato, to his home, 2131 First avenue. The body was removed by an agent of the undertaker, and he first saw it at the last-named place, and states that it was the body of Antonio Avocato, and that he was dead. At this place an autopsy was had upon the body, at which the undertaker was present. That after the 30th day of May he buried the body in Calvary Cemetery, and that the person so buried he had known, when alive, for three or four years, as Antonio Avocato. There was no cross-examination of this witness. Several of the witnesses—indeed, nearly all of them—testified that they knew the man called Antonio Avocato, that he was the person who was in the yard playing ball with the defendant and his two brothers, and that he was the same person who was subsequently chased in the street by the defendant and his brothers, and thrown down and stabbed. Salvatore Plizzi, a witness called by the defendant, and who witnessed the affray, testified: "I saw the man stabbed, and I knew the next day that that man was dead." While this was a positive statement, and connected the dead man with the affray, yet it is evident from the testimony that the witness only knew of the death from hearsay. Thomas Lingo, another witness for the defendant, testified that he knew Antonio Avocato in his lifetime by sight, and had been informed who he was. He witnessed the affray, and in his testimony he used the term in connection with Avocato as being the "deceased." Being questioned in respect of such matter, he stated:

"It means the man who is stabbed. A man who is stabbed is the deceased. That is the reason I describe Antonio Avocato as the deceased; not because he was sick. He wasn't sick. I understand that the 'deceased man' means the man who died."

And again he says in speaking of Avocato:

"I knew this man had been killed. I had only seen him a few times before. I knew he had been killed in an affray with these three brothers—my friends—and I knew the police were investigating."

Giovanni Selvaggio, a witness called by the defendant, testified:

"The dead one struck at Luigi. When Luigi was just at the door of the store, the dead man confronted Luigi and struck him. * * * Just as Luigi entered the hall, the dead man struck him."

And again:

"I say I saw the deceased strike the defendant here, twice—strike the defendant in the hallway of 319 East 115th street on the 30th day of May, 1902."

He further states that he was acquainted with Nelly Avocato, "the wife of the deceased."

Charles Cefola, also a witness for the defendant, testified that he knew Antonio Avocato. He witnessed the affray, and, after describing it, states: "I knew a man had been killed on the street. I saw the killing." And the witness, at several places in the testimony, denominated Avocato as the "deceased." Antonio Margone, a witness called by the defendant, testified that he witnessed the affray, and states:

"I always knew Avocato, the deceased. I knew him since the time when we had been born. Well, we were not exactly friends, thoroughly, but we used to meet together anywhere."

In the course of the trial, counsel for the defendant called attention to the lack of proof of the height of the parties, and, among other things, said: "The height of the deceased—there is no evidence in this case upon that point." During the whole course of the trial, both by the people and by the defendant, it was assumed that Antonio Avocato, the person who received the wounds, was the same person, the body of whom the undertaker buried. It was not shown that there was any other person by that name, and the proof was direct that a man of that name received the wounds, was subsequently found dead, and was buried. To the lack of proof we have already directed attention. The only failure is in the omission of a direct statement that the Antonio Avocato living and the Antonio Avocato dead was the same person. The proof was direct that such a person was at one time living, and that he died; and the direct testimony of some of the witnesses is that it was the same Antonio Avocato, although it does not clearly appear that these witnesses were speaking from actual knowledge.

The court would have been authorized to accept a plea of guilty from the defendant of the degree of crime of which he was convicted by the jury. Had he pleaded guilty, it would have been a confession on his part that the Antonio Avocato who was buried was the same person upon whom he inflicted the wounds. As it was competent for the defendant to have pleaded guilty to this crime, it was also competent for him upon the trial to admit that the person whom he was charged with killing was dead; and such admission, if made, would have dispensed with the necessity upon the part of the people of proving the same by other evidence. When, therefore, both the people and the defendant assumed that the person who was stabbed was the same person who was dead and buried, this amounted to an admission of such fact by the defendant; and, as the proof offered directly tends to establish the same fact, we think it sufficient to show by direct and competent evidence the death of the person charged in the indictment to have been killed.

It was disclosed by the autopsy that the cause of death was hemorrhage of the lungs, due to penetrating stab wounds of the right lung;

that these wounds passed in between the sixth or seventh and eighth ribs; that there was an incision of the lung, cutting the arteries; and that this came from knife thrusts. A knife was produced, claimed by the people to be the property of the defendant, and the physician who made the autopsy testified that the wounds might have been made with either blade of this knife.

We have, therefore, proof of the death of Avocato, that he came to his death through hemorrhage produced by knife thrusts, and it is uncontradicted that knife thrusts were delivered upon the body of the deceased by the defendant, or by his brother Domenico, or both of them. We have no hesitancy, therefore, in reaching the conclusion that the proof shows that the deceased came to his death at the hands of the defendant, or his brothers, acting in concert with him. This being the result of the evidence, it follows that the defendant was properly convicted of the crime of murder in the second degree, as all the elements which constitute that crime were present, and developed by the evidence. If the death of Avocato be regarded as established, serious contention is not made against such conclusion. If, therefore, no errors were committed upon the trial to the substantial prejudice of the defendant, the judgment of conviction should be affirmed. It is claimed, however, that such errors were committed— one in the admission of evidence, and the other in the submission of the case by the learned court to the jury. As to rulings upon the evidence, we only find it necessary to consider two questions in which it is claimed that error was committed.

The first is found in the testimony of the witness Marie Rosso. She testified to the commencement of the dispute between the deceased and Antonio Lagroppo. When the four individuals had passed out through the hall, she went to the street from her apartment, and observed the chase of the deceased. She was then asked: "Q. What did you do then? A. Then I commenced to holler, 'There goes on murder here.'" Motion was made to strike out this declaration. The motion was denied, the court ruling that it was part of the res gestæ. No exception was taken to the ruling. It may be that technically this evidence was not admissible, as it was a characterization by the witness of the impression made upon her mind; but it could not, in view of the testimony, be prejudicial to this defendant, because, upon undisputed proof, it was shown that murder did go on, and, as what was done was practically undisputed, the mere exclamation of a witness at the time of the transaction can scarcely be said to have been prejudicial to the defendant.

A more serious question, perhaps, is that which relates to the introduction in evidence of the knife. It is claimed that it was not shown to have been the property of the defendant, and was therefore highly prejudicial. Upon this subject the first witness called by the plaintiff testified that the defendant, when chasing the deceased, had a knife in his hand, and that he saw the blade. The knife was then produced and exhibited to the witness, and he stated that he had seen it before; that the defendant once had it out in his barber shop, and he saw him sharpening a pencil with it. The witness did make the statement, "I never saw it in anybody's possession," but he preceded that statement

by saying that he had seen it before, and followed it up by the statement of its use by the defendant in his barber shop. Marie Rosso also testified that she saw a knife in the hand of the defendant during the chase of the deceased. Anthony J. Berkowitz, a witness called by the defendant, testified that the defendant, when chasing the deceased, had a knife in his hand, and when the knife was produced he stated: "Well, I did not exactly see the handle, but the blade was a little bit—about as tall as that—a little bit taller. About six inches long, it was, where I seen it." And then he described the manner in which defendant used it upon the body of the deceased. Further testimony was given by Police Officer Beller, who stated that two days after the occurrence the defendant's wife and another lady came to the station house and gave him some information. The information was sought to be elicited, but was excluded by the court. After this the witness testified that he went into the house next to that occupied by the defendant, and on the top floor, underneath a starch box on the fire escape, he found the knife identified as the property of the defendant; and the further proof was that this knife could have inflicted the wounds which were found upon the deceased. When this officer informed the defendant that "the man who got cut in the game of cards is dead" (referring to deceased), the defendant said: "What was I going to do? Let him kill me?" No objection was interposed to any of this testimony, or to the introduction of the knife in evidence; and, if it had been, it would have been unavailing. The knife was identified as the property of the defendant, and the jury were authorized to find, under the evidence, that he had it open and in his hand when he was engaged in the pursuit of the deceased, and that he used it upon him. This, coupled with the character of the wounds, and the fact that this instrument would produce such wounds, was clearly sufficient to authorize the introduction in evidence of the knife. So far as there are any other questions raised upon the evidence, we are unable to find that any of the rulings were erroneous, to the prejudice of the defendant.

It is claimed, however, that the court committed error in the submission of the case to the jury. It is not contended but that the learned judge fairly submitted and defined the various degrees of the offense of which the jury were authorized to find the defendant guilty under the evidence. The court's instruction upon this point was quite comprehensive, both in statement of the offense, as defined in the several statutes, and also in the interpretation which has from time to time been placed upon these statutes by judicial decisions. The court did not, in any enlarged sense, submit to the jury, as a question for them to find, whether the defendant alone inflicted the wounds which caused the death; but upon this subject the court charged that if the deceased came to his death by knife wounds inflicted by one or the other, if done with intent to kill, and with premeditation and deliberation, it constituted murder in the first degree, if the evidence satisfied the jury of such elements beyond a reasonable doubt. The court then charged:

"If you are satisfied that the defendant and his codefendants, his two brothers, were acting with a common purpose, in concert one with the other,

and that this purpose was to take the life of the deceased, then they are guilty of the crime charged, no matter who used the knife or inflicted the wounds.".

Under the evidence this charge was undoubtedly correct, and laid down a sound proposition of law. The court followed this statement of the law with a summary of the evidence; and upon this evidence the jury were authorized to find that the defendants were in pursuit of the deceased with the intent either to kill him or to inflict upon him grievous bodily harm, and that during the pursuit, and continuously up to the infliction of the wounds, the defendants were actuated by a common purpose to commit a felony. Under such circumstances, the law is well settled that each and every one of the persons so engaged is a principal in the transaction, and is responsible for the acts of the other. Pen. Code, § 29; Ruloff v. People, 45 N. Y. 213; People v. Flanigan, 174 N. Y. 356, 66 N. E. 988; People v. Sullivan, 173 N. Y. 122, 65 N. E. 989, 93 Am. St. Rep. 582.

The evidence would clearly have justified a submission of the question to the jury as to whether or not the wounds which were found upon the deceased were inflicted by the defendant alone. Had the court submitted the question upon such theory, and had the jury convicted the defendant, there is an abundance of evidence to have sustained the conviction. The fact that the court did not submit this question, dissociated from the acts of the others, did not at all tend to the prejudice of the defendant. Logically such evidence would have justified a conviction of the defendant of murder in the first degree, and it may be that the inducing cause for the jury's finding a lesser degree of the crime for which the defendant was indicted was the fact that the court did not submit the question to the jury in this form. It does not, however, lie in the mouth of the defendant to make complaint of this fact, as its distinct tendency was to operate to his advantage; consequently in no sense can the defendant be said to be prejudiced by this omission. Besides, the court did state in one part of the charge:

"You need only to direct your attention to the inquiry, was this killing felonious; was it lawful; was it done with intent, by this defendant alone, or acting in concert with others, for a common purpose; was it done with premeditation and deliberation?"

It is evident, however, that the court was impressed with the view that the crime was committed by the three, acting in concert, and in the main the charge was submitted upon such theory.

It is further claimed that the court committed error in the following statement:

"It is not necessary for me to refer to the events preceding the flight. They have been most elaborately discussed by counsel, and the discrepancy between the witnesses on both sides has been dwelt on at considerable length. This, however, need not embarrass you in your deliberations, in view of the principles of law which I have read to you."

Then follows the language first above quoted, and the court continues:

"All the testimony that goes to what precedes is only important, I think, as concerning the motive actuating the parties."

It is claimed that by this charge the court took from the jury the importance of the facts which had been given in evidence of the circumstances surrounding the original dispute between these parties. Such, however, is not the charge. It relates, in its first part, to the discussion of counsel in the submission of the case and their statement of the discrepancies; and the court said, and all it said, was that they need not be embarrassed in their deliberations by that, and then reiterated the questions which they were to determine, and finally stated that the testimony of the circumstances out of which originated the dispute were important, as concerning the motive which actuated the parties, and this was all the importance such testimony had. No crime was committed at that time above that involved in an assault in the third degree, but it did bear directly upon subsequent features; and in accounting for them, and the intent and motive which prompted the pursuit and the stabbing, such testimony was important, and the court submitted it to the jury upon such theory. Thus the jury had laid before them such testimony for their consideration and its bearing upon the subject-matter at issue. The court in no wise limited the force and effect which the jury were authorized to attach to such evidence, and, in view of all of the circumstances proved upon the trial—indeed, not disputed—the assault in the yard became very much lessened in importance.

Complaint is further made that the court submitted to the jury the question as to whether the defendant, in what he did, was acting in self-defense, and the claim is that there was no theory developed upon the trial which authorized a submission of this question to the jury. We may admit the appellant's contention in this respect, but surely the defendant cannot complain because the court submitted a defense in his favor which the evidence did not justify. Under the charge of the court, the jury were authorized to find—and therefrom acquit the defendant—that he was justified in doing what he did, in order to protect himself from injury. The defendant's declaration was: "What was I going to do? Let him kill me?" This, in connection with the stab wounds upon his arm, was probably the inducing cause which prompted the court to submit such question; and the defendant cannot complain because the court pointed out to the jury a way by which they might exonerate the defendant from the commission of the crime with which he was charged, even though the evidence did not justify it.

The appellant's further contention in this regard is that the court misled the jury by submitting such question, when it ought to have submitted the question as to whether the defendant and his brothers were in pursuit of the deceased for the purpose of apprehending him on account of the stab wounds which he had inflicted upon the defendant. It may well be answered, in view of this contention, that, if the court was not justified in submitting the question of self-defense, it certainly was not justified from anything that appeared in the evidence in submitting the question as to whether the defendant was pursuing the deceased for the purpose of apprehending him and handing him over to justice. We have the undisputed facts of what was done, and therefrom it appears that there was the pursuit, the cap-

ture, and the killing; and such facts did not warrant a submission to the jury of pursuit for the purpose of apprehending the deceased. What the defendant and his brothers concededly did effectually destroy such contention.

The charge respecting good character may be subject to some criticism. People v. Childs (Sup.) 85 N. Y. Supp. 627. But no exception was taken thereto, and, as we are satisfied that the evidence was abundant in support of the verdict, we do not think it can be said that prejudicial error arose therefrom, as the jury were in fact authorized by the charge to consider evidence of good character as applied to the particular case.

The defendant also makes complaint of the charge of the court upon the subject of reasonable doubt. The court charged, "The people are obliged to make out their case beyond a reasonable doubt." And then the court read a decision of the Court of Appeals as to what constituted a reasonable doubt, in this language:

· "The defendant is entitled, as are all defendants in criminal cases, to have his guilt established to the satisfaction of a jury by competent evidence, and beyond a reasonable doubt. A reasonable doubt is such a doubt as a man of reasonable intelligence can give some good reason for entertaining if he is called upon to do so."

We are unable to find any defect in this definition, or in the burden placed upon the people with respect to the crime charged in the indictment. They were told, in terms, that the people were obliged to make out their case beyond a reasonable doubt. These are words of the broadest character. There was no limitation placed thereon respecting any essential feature constituting the offense which the people were not bound to maintain by affirmative proof, and this answered all requirements. In People v. Cantor, 71 App. Div. 185, 75 N. Y. Supp. 688, the construction which was placed upon the charge showed that the question of self-defense, which was urged in favor of the defendant, was not left to the jury in the form which the law required. Instead of charging the jury that the people were bound to establish beyond a reasonable doubt that the defendant therein was not justified in committing the homicide, the court placed such burden upon the defendant, and left it for the jury to say whether he had justified his act; and the court held that in so submitting the case the jury were not left to determine whether the people had established to their satisfaction, beyond a reasonable doubt, that the defendant was guilty of the crime charged. As we have already observed, the present charge answered such requirement with respect to every feature which the case presented.

Upon the whole case, we are satisfied that the evidence submitted was abundant to show the guilt of the defendant, and that his conviction was justified thereby. Therefore no injustice has been wrought upon him, and, as there are no exceptions which present legal error, and nothing which appears to show that any substantial right of the defendant has been prejudiced, we are required to render a judgment of affirmance. Code Cr. Proc. § 542.

It follows that the judgment of conviction should be affirmed. All concur.