(120 App. Div. 323)

PEOPLE v. FERONE.

(Supreme Court, Appellate Division, First Department. June 28, 1907.)

1. CRIMINAL LAW—EVIDENCE—WEIGHT.
   Since defendant in a murder trial testified in his own behalf and was the only living eyewitness to the shooting, if he testified untruthfully, the people's evidence should be taken most strongly against him.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 1248–1256.]

2. HOMICIDE—EVIDENCE—INSUFFICIENCY.
   Evidence held to sustain a conviction of murder in the second degree.

3. CRIMINAL LAW—HEARSAY TESTIMONY.

In a trial for wife murder, conversations between defendant and decedent and between her and his mother, as to her past conduct, and intentions as to the future respecting her association with other men, having occurred long before the homicide, and being no part of the res gestæ, were properly excluded as hearsay.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 973–983.]

4. SAME—INSTRUCTIONS.

In a murder trial, the court's statement, in charging that the Legislature has provided for a review of such cases by appellate courts at the expense of the state, evidently made to impress upon the jury the importance of taking the law from the court with the intent to show the jury they need have no concern respecting an error of law by the court, because ample provision was made for review, was not objectionable as tending to make the jury less attentive and careful in discharging their duties; the court having expressly instructed that they must discharge their duties without regard to the provision by which an appeal might be taken.

5. SAME—REFERENCE TO TESTIMONY.

In a murder trial, it was not error for the court in charging to refer to testimony concerning the witness' conversation with defendant the morning of the homicide, in which he spoke of killing his wife, without drawing attention to the fact that defendant denied the conversation; in the absence of a request that such attention be drawn.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 1996, 2005.]

6. HOMICIDE—APPEAL—HARMLESS ERROR—INSTRUCTION.

In a murder trial, any error of the court in referring to a suggestion made on the argument as to whether decedent could have killed herself, and directing the jury's attention to the question whether, in view of the course of the wounds, it was likely they were self-inflicted, and whether defendant would have left the city that night if his wife had committed suicide, was harmless, where, upon defendant excepting to the remarks and disclaiming the theory of suicide, the court withdrew them.

7. SAME—INSTRUCTIONS—INTENT.

In a murder trial, it was not error to instruct that, if defendant shot his wife, the jury could consider upon the question of design, a statement alleged to have been made by him to her mother the day of the homicide concerning killing his wife, if true, his going for his wife on that night to a restaurant where she worked, his taking her to the theater and to their room afterwards, the character of the weapon used, and the number of shots fired.

Appeal from Court of Special Sessions, New York County.

Joseph Ferone appeals from a conviction, in the court of Special Sessions, of murder in the second degree. Affirmed.

Argued before PATTERSON, P. J., and McLAUGHLIN, LAUGHLIN, HOUGHTON, and LAMBERT, JJ.

George M. Curtis, for appellant.
Robert S. Johnstone, for the People.

LAUGHLIN, J. The defendant has been convicted of murder in the second degree for shooting his wife, Annie Ferone, in a room in which they lived together in a flat occupied by his parents at No. 260 East Forty-Fourth street, on Saturday the 5th day of March, 1904, at about midnight. It was clearly shown by uncontroverted evidence

that the wife of the defendant died from the effects of a wound received by a bullet from a revolver discharged in their room at the time in question. There was no eyewitness to the shooting. The evidence of the people, with the exception of a confession and admissions made by the defendant to police officers, is circumstantial. In testifying in his own behalf, the defendant said that his wife attempted to shoot him, that he endeavored to take the revolver from her, and that in the struggle that ensued it was accidentally discharged.

We are of opinion that the guilt of the defendant was satisfactorily established, and that he had a fair and impartial trial, without the commission of any error prejudicial to his rights. It may be observed, at the outset, that since the defendant saw fit to take the stand in his own behalf, and is the only living eyewitness to the shooting, if he has testified untruthfully, the evidence adduced by the people should and may be safely taken most strongly against him.

They were married in Boston on the 23d day of December, 1902, after having met once in New York three or four years before and again by chance in Boston a month previous to the marriage. He was then only 18 and she 16 years of age. They lived together in Boston little more than a month, when, according to his testimony, she left him "because I lost my job," and he ascertained later on that she went to live with a man named Young, who was a waiter. She was a wayward girl, and had run away from home at the time she married the defendant, and had run away for short periods twice before, and on one of these occasions was found by her mother in a police station. After leaving the defendant, she was arrested on the charge of having stolen a pocketbook, and imprisoned six months in an institution in Boston referred to as the "Mission." The defendant called on her a few times at the mission, and subsequently came to New York and lived with his parents. It has not been clearly shown where she lived while separated from her husband, other than the period of her confinement in the "Mission." Notwithstanding the misconduct of his wife, of which he appears to have been fully aware, he was anxious to resume marital relations with her and requested her to return to him and sent her money to defray the expenses of the journey. She arrived in New York on the 17th day of January, 1904. He met her and took her to live with him in the room where the shooting occurred. At the time of the homicide, the defendant was working as a bootblack, and his wife was employed as a waitress at Holmes' restaurant, No. 2140 Third avenue, where she had been employed about three weeks; her hours of labor being from 10 a. m. to 7 p. m. Evidently she remained out late nights, and the defendant became suspicious of her conduct. The day before the shooting she came to work an hour earlier than usual, and was crying. She was quiet and cried more or less throughout that day. That evening defendant called at the restaurant at 8 o'clock and inquired for her, and was informed that she had left at 7 o'clock, and never remained after 7, at which he appeared surprised, and stated that he supposed she worked until 10 or 11. She did not return home that night, according to the testimony of the defendant, until about half past 3 a. m., and then said to defendant, who was in bed, that her mother was sick with diphtheria, and, when

he got up and suggested that they go over and see her, she said, "No, never mind," that her mother had a special nurse; whereupon he returned to bed. The defendant apparently was not satisfied with his wife's explanation of being out so late, and at about half past 11 o'clock that morning he went to her mother's house and inquired if the latter was sick, and if his wife had been there the night before, and was informed by his mother-in-law that she had not been sick, and his wife had not been there.

According to the testimony of the mother-in-law, he informed her that his wife came home late the night before crying, and said that her mother was sick, but that she subsequently admitted that this was not true, and then claimed that she had been to the theater with her mother and sister. The mother-in-law also testified that he complained that his wife was spending all of her money, having a new waist and a new pin, and that some of her dresses were missing. That she said to him that she had given her daughter the pin, and that she had never had any trouble with her daughter "until that young man took her away from my house, and then my trouble began." That he thereupon said: "If I knew that Annie done such things as she says, I could almost kill her. I don't know what prevented me last night from doing it." That he said he wanted to go out the night before "with the revolver," but that his mother had it "closed up" in her room and would not give it to him. That she then manifested alarm, whereupon he said: "I only want the revolver for my self-defense, because it is such a lonely place." That the postman brought two letters for her while he was there and delivered them to her daughter, from whom the defendant took them and examined them, observing that they had come from Boston. That she then demanded the return of the letters and opened and read them, and said that she had written to Boston to learn how his wife had conducted herself there. That he requested and urged that he be permitted to see the letters, and be informed from whom they came; but that she refused his request. That, in urging her to permit him to see the letters, he manifested a willingness to do anything for her, and she then said to him that she deemed it advisable that she take her daughter back to live with her, and expressed the view that she could get a divorce from him, because she was under age, to which he replied that she could not do it, and cited a case that had recently appeared in the newspaper, where, he said, "The same thing happened, that the man wanted to take the girl away, and he couldn't do it." That he said, in answer to a question as to how his wife was that morning: "She is again all right. She went to work and kissed me when leaving." That the witness thereupon said to him: "If you think she is not good to you, why don't you watch her? You know where she works, and you know when she stops working and leaves the place. Then I would stay there outside, and see if she does anything wrong." To which he replied: "Well, I don't know. I haven't got much time. I'll see what I can do."

The defendant testified that about 7 o'clock that evening he met his wife, and they went to the Star Theater at 107th street and Lexington avenue. That, after the theater was over, they went home, arriving

there between half past 11 and 12 o'clock and immediately went to their room, and he locked the door. That they started to undress. That his wife got on a chair and took a hat box, in which she kept her hat, and in which his loaded revolver was, and had been since before she returned from Boston, off a shelf, and placed it on the ice box preparatory to putting her hat in it. That he then said to her: "Annie, I have been to your mother's house to see how she was feeling, and she told me that she was feeling all right, and that she was not sick at all." And that he asked his mother-in-law if his wife had been "there at her house Thursday afternoon from half past 3 until 3 o'clock Friday morning, and was informed that she was not." And that he had also asked his mother-in-law if his wife had been over there "Saturday or Sunday previous until Thursday," and was informed that she had not. That he then asked his wife where she had been those nights, to which she replied "that it was none of my business, and that she could go wherever she liked, and I couldn't stop her." That he then said: "Annie, you can't go out with other men." And she said she could, and he said she couldn't, and she reiterated that "she could, and I couldn't stop her either." That he then tried to reason with her and told her that she was not living up to her promise when she came from Boston, to which she replied: "Well, I ain't in Boston now. I'm in New York, and I can do whatever I like, and you can't stop me either." That he said she must stop, and she replied that she would not stop. Whereupon he said: "Annie, you have got to stop it, or leave this house, and go to your mother's house, or wherever you choose." And she then said: "Well, before I go, I'll do you, you ginny." That she then turned around and grabbed an ice pick and struck at him. That he dodged the blow, grabbed her hands, and knocked the ice pick out of her hands, saying to her: "Annie, do you know what you are doing? Are you crazy?" To which she replied: "No, I ain't going crazy. I'll do you, you ginny, anyhow." That, after he pushed her away, she turned around and grabbed the revolver from the hat box, which she had placed on the ice box, and fired a shot at him, which he dodged. That he then "grabbed her, and grabbed hold of her hands, and we struggled for the revolver; and, while we were struggling for the revolver, I says: 'Annie, let go. What are you doing?'" And she said: "I won't let go." Whereupon he said: "Annie, are you going crazy?" To which she replied: "No I ain't going crazy." That then they struggled for the revolver, "and we struggled until the revolver went off, and then I saw my wife drop towards the bed. I didn't know whether she was dead, and I went out of the room. I became so excited that I went out of the room."

His story that the revolver was discharged the second time accidentally might not be improbable, if it had been fired only twice altogether; the first time being by her at him. But, when it is remembered that the undisputed evidence shows that it was fired three times in all, his explanation presses credulity beyond the bounds of reason. The revolver might have been cocked once, and the trigger might have been pulled once accidentally; but it is highly improbable that, after the revolver was both cocked and discharged once accidentally, the husband and wife would have continued their struggle and their grip upon the re-

volver until it was again accidentally cocked and discharged. The revolver belonged to the defendant, and the fair inference from the evidence is that he was jealous of her and remonstrated with her concerning her conduct, and that, either because she would not promise to reform, or in a jealous rage, he determined to take her life. The evidence shows that he had good ground for complaint, and that he would have been justified in refusing to live with her, and probably could have obtained a divorce on account of her misconduct; but that affords no justification for the homicide.

Moreover, his story is improbable in other respects. According to his testimony, the only reason assigned for his wife attempting to hit him with the ice pick, and subsequently attempting to shoot him, was his persistence in insisting that she must refrain from going with other men or go back to her mother. Even though she may have been independently inclined, as he testified, and may have decided to disregard her marital obligations and to go out with other men when and as she pleased, it is difficult to believe that she could have been so mentally constituted as to regard his remonstrance against such conduct as so unreasonable and unjustified that, if he would not submit to her living with him as his wife with the privilege of going with other men as she pleased, she would take his life. He gives no satisfactory account of the purchase of the revolver. He claims that he purchased it at a hardware store down town in the month of December, before, for protection; but he claimed to be unable to specify the store at which he purchased it. He admits that after purchasing the revolver he loaded the five chambers with cartridges, and says that he then before she returned to live with him placed the revolver in the hat box on the shelf above the ice chest, where it could not be reached by him or by her without standing on a chair. No chair was found in the room by the officers who entered it shortly after the shooting. He claimed that she took the hat box from the shelf after returning from the theater and uncovered it with a view to putting her hat in it; but the cover was found on the box, and a hat, evidently the hat she had worn, was hanging on the door. Her body was found as if she had been standing against the side of the bed, or sat upon it at the time she was shot, for her feet were resting on the floor and the body reclining backwards upon the bed. One bullet had penetrated the abdomen, and the other entered her bosom between the first and second ribs, passing through the heart and causing death. It is not only improbable that the revolver could have been twice cocked and discharged accidentally, as testified to by the defendant, but that testimony is rendered the more improbable by the fact that both balls entered the body of his wife; neither having touched him nor having been discharged into the room without touching either of them.

Instead of manifesting regard or grief over the death of his wife, he immediately put on a soft hat, turned up his coat collar, and left the building, and made his way to the city of Philadelphia, where he was found six weeks later, receiving mail at the general delivery of the post office under the assumed name of "E. J. Thompson." Officer Pinkerton, of the Philadelphia police force, made the arrest and took the defendant to police headquarters in that city. He testified that on

the way to headquarters he asked the defendant why he shot his wife, to which the defendant replied: "Well, that's what everybody says." Pinkerton then said: "Why didn't you give yourself up?" To which the defendant replied, "My mother commenced to cry and told me to go away." After asking Officer Pinkerton whether he should give his right name at the police station, and being answered in the affirmative, he gave his correct name. Officer Pinkerton subsequently brought him from the cell to the doctor's room, in which Sergeant Crawford of the Philadelphia police force and Officer Petrosine of the detective bureau of the New York police force were present. According to the testimony of the three officers, he was then asked if he desired to make a statement, and he answered in the affirmative, and no pressure was brought to bear upon him to induce a statement, nor was any promise made. This he admits. Crawford testified that he informed the defendant that any statement that he might make might be used against him, and that he still manifested a willingness to make the statement. The three officers testified that Crawford then propounded questions to defendant which he answered, and Crawford wrote in narrative form the substance of the statement; that, when the statement was completed, Crawford read it over slowly to the defendant, requesting him to listen and to call attention to any correction he might desire to have made; that, after hearing it read, the defendant said it was all right and true, and that he was willing to sign it; that he signed it, and the three officers signed as witnesses. Crawford says that he then took the statement down to the clerk's office and had a copy made on the typewriter, and subsequently brought the typewritten copy upstairs and requested the defendant to read it, and that, after making some corrections, the defendant signed the typewritten copy also. Crawford retained the original statement until the trial, and delivered the typewritten statement to Petrosine, who subsequently brought the defendant to New York under extradition papers. The original statement, but not the typewritten copy, was received in evidence.

It is difficult to understand the appellant's criticism of receiving this confession in evidence. It was satisfactorily proved. The defendant admits that he was brought into the room in the presence of the officers, and that Crawford asked him questions and was writing, and that he subsequently signed the paper; but he denies that he answered any question. He admits that all of the facts, with the exception of the statement concerning the shooting of his wife, contained in the statement, were true; and he does not claim that his signature thereto was induced either by duress or false representations. He makes the bold assertion that he was hungry and thirsty, and that on the way to headquarters Pinkerton promised that he would receive food after arriving there; but he does not say that he was promised food or drink on condition that he signed the statement, or that they were expressly denied to him until he made a statement. He denies that he heard the original statement read, or read the copy, and claims that the papers were so folded when he signed that he was not permitted to read any of the contents. That merely presented a question as to the weight of the evidence, but it did not render the confession incompetent. He is unable to assign any reason for having signed the statement, other than

that he was requested to do so, and he does not claim to have objected or to have inquired why his signature was desired. In the statement received in evidence as a confession, the defendant recited the material facts already stated with respect to his marriage and trouble with his wife, and said that, after he charged her, on returning from the theater, with having deceived him as to where she was when she remained out late nights, and with having been with other men: "She wouldn't answer or talk to me. I then pulled a pistol out of my pocket and shot her." That he remained in the house about half an hour after the shooting, and his mother began to cry, and "told me to go out," and that he went to Jersey City and remained at a hotel there that night, and then went to Philadelphia and lived at 918 Green street under the name of B. J. Thompson until his arrest.

Officer Petrosine testified that on the way from Philadelphia to New York the defendant asked him, "Do you think I made a mistake in making that statement, that confession?" and, upon receiving no answer, further asked, "Do you think they will send me to the electric chair?" and, upon receiving no answer to this, said that he was foolish to have killed his wife and made no claim that the killing was accidental. The defendant denied this conversation. The revolver was found in the room with three empty and two loaded shells. He testified that his wife bought a new hat in February, and asked if he had a box for her to put it in, and says that he then took this hat box containing the revolver down and gave it to her, and that she saw the revolver. There were two hat boxes found on the ice chest with covers on 'and hats in them. She might have taken the revolver out of the hat box before he discovered her movements; but it is not reasonable to suppose that she would remove the revolver with intent to use it immediately on him, and delay action while she was placing the cover on the box, or that if she had done so he would not have discovered it.

It is claimed that the death of the defendant's wife is not shown to have been caused by one of the bullets fired from the revolver, and that the body upon which the autopsy was performed, and concerning which the expert testimony was given, was not properly identified as that of defendant's wife. We deem it unnecessary to 'discuss these contentions in detail. The death of the defendant's wife was proved by direct evidence, and the death of the woman upon whom the autopsy was performed, which was satisfactorily identified by circumstantial evidence as that of his wife, was shown by competent medical evidence to have been produced by a bullet which pierced her heart, and was shown by other evidence to the satisfaction of the jury, and to our satisfaction, beyond a reasonable doubt, to have been fired by the defendant, which is sufficient to sustain his conviction. People v. Benham, 160 N. Y. 402, 55 N. E. 11; People v. Palmer, 109 N. Y. 110, 16 N. E. 529, 4 Am. St. Rep. 423; People v. Way (App. Div. 1st Dept. May, 1907) 104 N. Y. Supp. 277; People v. Deacons, 109 N. Y. 374, 16 N. E. 676; People v. Burness, 178 N. Y. 429, 70 N. E. 966; People v. Lagroppo, 90 App. Div. 219, 86 N. Y. Supp. 116, affirmed 179 N. Y. 126, 71 N. E. 737; People v. O'Connell, 78 Hun, 323, 29 N. Y. Supp. 195.

The exclusion of conversations between the defendant and his wife, and between her and his mother shortly after her return from Boston, with respect to her past and future conduct, is assigned as error. These declarations occurred long before the homicide, and, being no part of the res gestæ, were properly excluded as hearsay. Kennedy v. People, 39 N. Y 245; Reinhart v. People, 82 N. Y. 607; Greenfield v. People, 85 N. Y. 75, 39 Am. Rep. 636; People v. Hawkins, 109 N. Y. 408, 17 N. E. 371; People v. Patrick, 182 N. Y. 131, 74 N. E. 843; People v. Dolan, 186 N. Y. 4, 78 N. E. 569.

The learned counsel for the appellant also complains of the charge of the learned court, and particularly of the allusion therein to the fact that the Legislature has provided for a review of such cases by Appellate Courts at the expense of the state. These remarks were evidently made with a view to impressing upon the jury the importance of taking the law from the court; the intention apparently being to show the jury that they need have no concern concerning an error upon the law by the court, for the reason that ample provision was made for a review. On an exception being taken to the remarks, the court expressly instructed the jury that they must discharge their duties without regard to the fact that provision had been made by which an appeal might be taken. It is claimed that the effect of the instructions was to render the jury less attentive and careful in the discharge of their duties. We are of opinion that it did not have that effect.

The learned counsel for the appellant also complains that the court drew the attention of the jury to the testimony of the mother-in-law concerning her conversation with the defendant the morning of the homicide, in which he spoke of killing his wife, and did not draw their attention to the fact that the defendant denied this conversation, or to the fact that his mother testified that she did not have his revolver. It is not the duty of the court to draw the attention of the jury to every item of evidence. The jurors must have remembered that this testimony was controverted, and, if the learned counsel for the defendant thought that the jury did not recall that fact, or might infer that the court deemed the controverting testimony untrue or unimportant, he should have drawn it to the attention of the court.

In the course of the charge, the court referred to a suggestion, made on the argument of the case, as to whether it was possible for the wife to have killed herself, and directed the attention of the jury to the question as to whether, if, in view of the position and course of the wounds, it was likely that they were self-inflicted, and whether the defendant would have left the room, and left the city that night, if his wife committed suicide. Counsel for the defendant thereupon excepted to the remarks of the court, and expressly disclaimed the theory of suicide, whereupon the court withdrew the remarks. The inference is that the learned district attorney, with a view to satisfying the jury beyond a reasonable doubt that the death of the defendant's wife was caused feloniously, argued to the jury that it was not possible that the wounds could have been self-inflicted. Without intending to hold that the comments of the court were not fairly within the bounds of judicial discretion, we are of opinion that with the withdrawal of the remarks there remains no ground for just criticism.

The learned court, in the course of the charge, said to the jury:

"If you find that it was 'the defendant who shot his wife, you may take into consideration, upon the question of design, the statement that he is alleged to have made to the mother of his wife on the morning of the day of the shooting, if true, his going for her on that night to the restaurant, his taking her to the theater, his taking her to the room after the theater, the character of the weapon used, and the number of shots that were fired from the weapon."

The learned counsel for the appellant excepted to those remarks. The criticism is that, being her husband, he had a right to go to the restaurant, escort her to the theater, and take her to their room. That proposition is so elementary that the jurors must have understood it. The learned court did not say that each of these facts was evidence of guilt, or was to be weighed against the defendant. He merely alluded to the evidence on these points as being the important evidence upon which the question of the presence or absence of guilty intent was to be determined. We are of opinion that the jurors were not misled by these remarks of the court to the prejudice of the defendant.

It follows that the judgment should be affirmed. All concur.